Wallach, M.
The People filed an information, charging the defendant with an alleged violation of subdivision 10 of section 176 of the Sanitary Code of the City of New York, alleging, in effect, that the defendant manufactured, kept or offered for sale or represented as selling ‘ ‘ French Ice Cream ’ ’, which was adulterated with an artificial yellow coloring to simulate an egg yolk product in its 1 ‘ French Ice Cream ”.
It has thus charged, as a result of the acts on the part of the defendant, in so doing, that it transgressed the provisions of the Sanitary Code above referred to.
The defendant elected to proceed to trial before a City Magistrate, sitting in the above matter, as a duly constituted Court of Special Sessions.
The People, by way of proof to support the information against the defendant, offered the testimony of an inspector of the department of health, who testified that he visited the place of business of the defendant on August 12, 1955, and selected at random, from a quantity of cartons of “ French Ice Cream ” in the premises of the defendant, six cartons of a bulk, consisting *455 of three cartons of vanilla and three cartons of chocolate ice cream. The usual identification seals were placed upon each of the cartons by the inspector. One carton each of vanilla and chocolate, specified ‘ ‘ French Ice Cream ’ ’ was given to the defendant, and two cartons each of the specific flavors in question were taken off the premises, and personal delivery thereof was made to the chemist of the city. Both samples of ice cream in question were described and represented on the cartons solely as ‘ ‘ French Ice Cream ’ ’.
There was no other representation made by the defendant as to the content of its product in print or otherwise, in connection with its manufacture and sale of this ice cream product.
The chemist testified, that as part of his duties while working for the department of health of the City of New York, he analyzed the vanilla ice cream in question, and found that the product contained a chemical called “ tartrazine ” which is a chemical producing yellow coloring that simulates the color of the yolk of an egg, and further testified that this particular artificial coloring was a certified dye, harmless in its use for various food products including ice cream.
Although the defendant at the trial and in its brief raised the question regarding the propriety of the tests and the circumstances surrounding the making of the same, the court finds the facts, substantially, as concluded by the city chemist.
Following the submission of the People’s case, the defendant offered no proof whatsoever, and rested.
This, in turn, required the court to resolve the determination of the entire matter, both upon the facts and the law, solely upon the entire People’s case.
The issue to be adjudicated herein is whether or not, under these set of facts, there has been an answerable violation of the provisions of the Sanitary Code, already noted.
The defendant takes the position that the statute under which it had been arraigned and tried, is nugatory, of no force and effect, and contravenes the express provisions of subdivisions 3 and 4 of section 71-a of the Agriculture and Markets Law.
It is strongly urged by the defendant, amongst other things, that the Municipal Sanitary Code enactment (§ 176, subd. 10), is an undue encroachment upon the legislative ambit of authority relating to this entire subject matter, and is therefore inconsistent and contrary to its express provisions.
Further, the contention is likewise made by the defendant that the statute, so promulgated by the municipal agency, is void, as being vague and indefinite and not providing for *456 proper standards for the manufacture of “ French Ice Cream ”, and on that account likewise void and of no force and effect.
The People, on the other hand, maintain that this particular health statute, under which it has instituted the prosecution of the above matter, is a proper one, and is consistent with its authority to enact legislation of similar import, and further that the statute in question merely enlarges and supplements the orbit of authority duly delegated to the city agency under the express provisions of the city charter. (New York City Charter, §§ 556, 558, subd. b.)
In order to best analyze the respective statutes, their pertinent provisions thereof, for the sake of brevity, will be herein set forth. ‘ ‘ § 556. Authority, duties and powers of the department. —a. The department shall have jurisdiction to regulate all matters affecting health in the city. b. The authority, duties and powers of the department shall extend over the city, and over the waters adjacent thereto, within the jurisdiction of the city and within the quarantine limits as established by law.” § 558 * * * b. The board of health is hereby authorized and empowered from time to time to add to and to alter, amend or repeal any part of the sanitary code, and may therein publish additional provisions for the security of life and health in the city and confer additional powers on the department not inconsistent with the constitution or laws of this state or with this charter ”.
In conformity with the above authority of the charter, the following section of the Sanitary Code was duly adopted. “ § 176. Frozen desserts and ice cream mix; adulteration or misbranding prohibited. No person shall bring into the City of New York, manufacture or have, keep, offer for sale or sell in said City, any frozen dessert or ice cream mix that is adulterated or misbranded. A frozen dessert or ice cream shall be deemed adulterated: * * * (10) In the case of ice cream labeled, offered for sale or represented as ‘ French Ice Cream * or Custard ’ or Frozen Custard ’ or any other frozen dessert wherein representation is made that egg or egg product is used, if it contain any artificial yellow color, or color simulating egg yolk, or if it contain a less proportion of clean, wholesome egg yolk solids than the equivalent of five dozen egg yolks to each ninety pounds of other ingredients used.”
Subdivisions 3 and 4 of section 71-a of the Agriculture and Markets Law provide:
“■ 3. Ice Cream ’ means the pure, clean frozen product made from a combination of two or more of the following ingredients: *457 Milk products, eggs, water, and sugar with harmless flavoring and with or without harmless flavoring and with or without harmless coloring, and with or without added stabilizer composed of wholesome edible material; and in the manufacture of which freezing has been accompanied by agitation of the ingredients. It contains not more than one-half of one per centum by weight of stabilizer, not less than ten per centum by weight of milk fat, and not less than eighteen per centum by weight of total milk solids; except when fruit, nuts, cocoa or chocolate, maple syrup, cakes or confections are used for the purpose of flavoring, then it shall contain not less than ten per centum by weight of milk fat and not less than eighteen per centum by weight of total milk solids, except for such reduction in milk fat and in total milk solids as is due to the addition of such flavoring, but in no such case shall it contain less than eight per centum by weight of milk fat or less than fourteen per centum by weight of total milk solids. In no case shall any ice cream contain less than one and six-tenths pounds of total food solids per gallon.
" 4. ‘ Frozen Custard ’ means French ice cream, French custard ice cream, ice custard, parfaits and similar frozen products. Frozen custard is a clean, wholesome product made from a combination of two or more of the following ingredients: milk products, water and sugar with harmless flavoring and with or without harmless coloring, and with or without added stabilizer composed of wholesome edible material; and in the manufacture of which freezing has been accompanied by agitation of the ingredients. It contains not more than one-half of one per centum by weight of stablizer, not less than ten per centum by weight of milk fat, not less than eighteen per centum by weight of total milk solids and not less than one and four-tenths per centum by weight of egg-yolk solids. In no case shall any frozen custard contain less than one and six-tenths pounds of total food solids per gallon.”
This ever perpetual question of conflict of jurisdiction and validity between legislative enactments of political subdivisions of the State, with that of general State-wide statutes, enacted by the Legislature within the sphere of the orbit of its authority, has been the subject matter of many of the reported adjudications.
The broad powers conferred by our Constitution and substantive law upon the legislative body of any particular city or other political subdivision of the State, to enact and amend local laws relating to property, safety and health of its inhabitants, is ever subject to the limitation that such laws shall not be *458 inconsistent with the Constitution and the laws of the State, nor may it alter or supersede any act of our Legislature. (Matter of Tartaglia v. McLaughlin, 190 Misc. 266, affd. 273 App. Div. 821, revd. 297 N. Y. 418; N. Y. Const., art IX, § 12; City Home Rule Law, §§ 11,12; New York City Charter, § 558; cf. People v. Weil, 286 App. Div. 753.)
The State has a prime concern in seeing that the general good health of its citizens is ever maintained, and in accordance with this paternalistic policy, it has surveyed the entire field and enacted legislation for the protection of health and the safety of its citizenry at large, especially in particular here, with reference to food and food products regularly consumed by the public at large.
The whole body of substantive law that led to the original enactment of the Agriculture Law at the turn of the twentieth century, superseded by the Farms and Markets Law, entwined as it was previously with certain provisions of the General Business Law, is now evidenced by the enactment of the Agriculture and Markets Law.
There are varying provisions contained therein that affect the manufacture, sale and distribution of multiple food and food products to the public. The avowed policy of the Legislature, in the assemblage of this general statutory scheme or layout to implement the social policy of the law and realistically carry forth its beneficent objectives, may be found in the very declaration of a policy and the purpose for its enactment, as stated in the law itself. (Agriculture and Markets Law, § 3.)
The State, in effect, after a seasoned survey of the public needs in relation to this subject matter, finally concluded that it should authorize the manufacture in this State of ice cream or frozen products, under adequate safeguards, and in this particular case, might do so, with or without the use of harmless coloring, the option being left solely to the manufacturer or purveyor thereof. (Agriculture and Markets Law, § 71-a, subd. 4; Browne v. City of New York, 241 N. Y. 96; Adler v. Deegan, 251 N. Y. 467; Matter of Kress & Co. v. Department of Health of City of N. Y., 283 N. Y. 55.)
It evidently did not feel that the use of this artificial coloring was injurious to the citizenry or the consumer public, for if it had thought contrariwise, undoubtedly the statute would have completely negated and precluded the use thereof.
Nowhere is it claimed or even intimated that a fraud has been perpetrated by the defendant upon the consumer public at large, through the medium or the use of this coloring, for no repre *459 sentation was made by the defendant as to its alleged claim of use of any egg yolk in the manufacture of this product.
The People do not as much as contend that the defendant did expressly make such a warranty in connection with the marketing of its product, for its own chemist has admitted that this particular coloring is a harmless one and is generally used in many food products. The city has urged by indirection, though, that the public is misled by this coloring and has argued inferentially that by being so misled that a fraud is perpetrated upon it.
However, there was no evidence adduced which would indicate any such state of facts, especially in the absence of the making by the defendant of any such warranty, in writing or otherwise, in connection with the marketing of its product, nor did the defendant claim that its product did contain something which in fact it had not.
The People’s contention relating to the public being misled because of the presence of this harmless coloring, is unsupported by the evidence, nor is any such conclusion warranted because of the manner in which the product is marketed.
On the contrary, we do not have here a situation where a manufacturer of food products or food stuffs, by fraud and deceptive devices, attempts to create in the mind of the consumer public, the existence and the presence of a food constituent, which in fact is not present therein, nor is this a situation wherein an ingredient named or labeled in a particular food product, is found to be harmful and deleterious to the public user thereof. The gravamen of the complaint against the defendant herein is that it has utilized an artificial coloring in violation of the municipal Sanitary Code. (§ 176, subd. 10.)
The orbit of legislative authority is not one that may be encroached upon by any political subdivision of the State, without express legislative authority so to do. This is even more plainly offensive when viewed in the light of the fact that the State itself has set up standards and prerequisites which we must presume are proper, and has utilized safeguards for the best interests of the public at large, only for these cares and precautions so outlined, to be superseded and allegedly made more vigorous and more extensive by local legislative fiat, acting under a source of claimed powers that are in fact nonexistent or otherwise improper. (Quaker Oats Co. v. City of New York, 295 N. Y. 527, 537-539.)
Numerous are the instances where a political subdivision of the State has, by virtue of its home rule authority, set in motion *460 its lawmaking power, and attempted to create thereby a standard of conduct for its citizenry only to find that in the end result it has exceeded the authority originally passed onto it by express statutory design. (People v. Del Gardo, 1 Misc 2d 821; Good Humor Corp. v. City of New York, 290 N. Y. 312; Quaker Oats Co. v. City of New York, supra; People v. Wile, 286 App. Div. 753, supra, People v. Wile, 208 Misc. 548.)
In bringing into esse the entire Agriculture and Markets Law, the Legislature has made an overall survey and evinced a general plan and outline for protective public good in the proper policing of various edibles and food products that reach the consumer public.
The court must take judicial notice of the fact and presume that the wisdom for and adequacy of its enactment into the body of our law, covering this entire field, was a proper one and only arrived at after appropriate care and due consideration was given by the lawmaking arm of our form of government to meet the exigencies of public health requirements.
Oddly enough, this conflict of jurisdiction between the Department of Agriculture and Markets of this State, and the department of health of this city, has on more or less recent prior occasions been reviewed by our court of last resort.
Thus, in Matter of Kress & Co. v. Department of Health of City of N. Y. (283 N. Y. 55, supra), the Court of Appeals was faced with a situation where the petitioner therein instituted an article 78 proceeding to direct the board of health and the department of health of the City of New York, to rescind a denial of an application for a permit to manufacture frozen desserts at its cellar premises in the city here, and for alternative relief for a grant by the city agency for said permit, which had been steadfastly refused by the municipal health agency.
It appears that although the Commissioner of Agriculture and Markets of the State had previously issued a license and permitted the manufacture of frozen desserts in the cellar of the petitioner’s premises, the city health commissioner refused to authorize the same and issue a health permit for such manufacture because it had promulgated a rule precluding the manufacture of frozen desserts in the cellar of any premises in the City of New York.
The Court of Appeals, in reversing both the intermediate appellate court, as well as Special Term, directed the issuance of the permit in question, and in finding that the rulemaking authority of the health commissioner, under the circumstances, had been excessive and had run counter to the State statute, *461 the court, speaking through Conway, J. (now Chief Judge), pertinently observed in regard to this subject matter as follows (pp. 59-60):
“ The question presented then is, may the city on these facts forbid that which the State has specifically permitted. A municipality which is empowered to adopt health regulations may, in spite of general regulations by the State, adopt additional regulations or requirements where there is a real distinction between the city and other parts of the State. They must be based upon special conditions existing in the city. That is not the case here. The State has gone over the whole field. The State has designated an official who is empowered to grant a permit after he has made an inspection and found the premises to be sanitary. After the issuance of such a permit nothing remains to be done. The State having covered the whole field, the city may not make regulations of its own, inconsistent with the laws of the State, and prohibit the manufacture of frozen desserts in a cellar, even though the cellar is sanitary and the manufacture of frozen desserts therein has been authorized by the State.
“ A general grant of local administrative power never confers authority to abrógate a general State statute.
“ In Jewish Consumptives’ Relief Society v. Town of Woodbury (230 App. Div. 228; affd., 256 N. Y. 619) a town ordinance, in effect prohibiting the erection of a tuberculosis hospital within the town limits, was held void as in contravention of the Public Health Law (Cons. Laws, ch. 45), a State statute. Presiding Justice Lazansky said (on page 234): The authority of a municipality to abrogate State law is never implied or inferred. It is only derived from express grant, never from a general grant of power. A State policy may not be ignored by a.municipality unless it is specifically empowered so to do in terms clear and explicit.’
“ In People ex rel. Kieley v. Lent (166 App. Div. 550; affd., 215 N. Y. 626) the court said: ‘ The intent that municipal corporations by ordinance can supersede the State law will not be inferred from general grants of power, nor will such authority be held to exist as an implied or incidental right. (Dillon, Mun. Corp. [5th ed.] § 632.) As all municipal authority comes from the Legislature, the provisions of municipal charters, however broad, are subject to such restrictions as may be imposed by general laws.’ (See, also, City of New York v. Maltbie, 274 N. Y. 90; People v. County of Westchester, 282 N. Y. 224.)
“No case in this court is contrary to what ice have said here.” (Italics the writer’s.)
*462 The corporation counsel has attempted to escape the impact of the holding in the Kress & Co. case (283 N. Y. 55, supra) by urging that distinguishing features are present there and not present in the case at bar, which warrant a departure from the thesis so judicially pronounced therein.
The People claim that in the Kress holding (supra) that because the orbit of jurisdiction was referable to cellar manufacturing both in the State and Municipal Law, that the verbiage “ cellar ” is the sole index that properly rendered nugatory the duplicity and improper overlapping of jurisdiction by the city agency.
The rationale of the decision, when viewed in the light of the express provisions of the statute sought to be superseded by the provisions of the Sanitary Code, indicates its direct applicability to the factual situation herein presented. The distinction herein by the People is not one of kind or cogent reasoning, but is devoid of legal distinction that does not merit further discussion in regard thereto.
So, too, the position taken by the defendant regarding the absence of proper and definite standards, promulgated by the board of health for the make-up of ‘ ‘ French ice cream ’ ’ in regard to its quest for jurisdiction over this particular phase of the subject matter, is one that appears to be not without merit, but in view of the conclusion already reached, a discussion of this phase of the matter is rendered unnecessary, and a determination relative to that aspect of the matter is not directly passed upon herein.
The court is ever mindful of the responsibility of the health agency of a municipality to promulgate through proper legislative authority, statutes, rules or regulations, which have the effect of substantive law, that will insure the health, safety and welfare of the public at large. The court has no quarrel with the health department’s good intentions and in effect commends its zealousness in attempting to promote the best sanitary interests of the community.
However, in this instance, the artificial coloring present in the product of the defendant is a chemical which even the People concede is not harmful and is generally used in food, and food products.
Much more, there has been no proof of any misrepresentation or misbranding by the defendant in the manufacture and sale of its commodity, directly or indirectly, to the effect that the item in question contains egg or egg properties so as to deceive and mislead the consumer who purchases the same.
*463 In the absence of these harmful aspects of fraud, deception or presence of harmful ingredients in manufactured and marketable edibles, it is not for the court to legislate concerning the wisdom of the law and its express statutory language, as it so finds it. On the other hand, it is for the court rather to accept the conclusion of the Legislature in expressly permitting the manufacture of this type of frozen food products, with the absence of egg content, and containing the presence of artificial coloring therein.
If there is any compelling need for a change in the prerequisites and standards for the manufacture of this or related food products, necessitating the deletion of artificial coloring, or adding other components therein, the remedy must come from the Legislature. Certainly it is not for the court to adjudge the defendant guilty of a course of conduct that the Legislature has expressly authorized and upon which it placed its stamp of approval.
In view of the foregoing, the motions made by the defendant to dismiss the information are granted, and the information is hereby dismissed, and the defendant exonerated and discharged.